FEDERAL LAND BANK OF SPRING-
FIELD, Federal Intermediate Credit
Bank of Springfield, Springfield Bank
for Cooperatives, Federal Land Bank of
Texas, Federal Intermediate Credit
Bank of Texas, and Texas Bank for
Cooperatives, Plaintiffs,

v.

FARM CREDIT ADMINISTRATION
and Farm Credit System Capital
Corporation, Defendants.

Civ. A. No. 86–0214–F.

United States District Court,
D. Massachusetts.

Feb. 17, 1987.

On Motion To Dismiss March 17, 1987.

**1240**

Arvid E. Roach, II, William H. Allen, Newman T. Halvorson, Jr., John F. Seymour, Covington & Burling, Washington, D.C., Lewis E. Haase, Farm Credit Banks of Springfield, Springfield, Mass., for plaintiffs.

C. Brian McDonald, Asst. U.S. Atty., Theodore C. Hirt, Lori Fields, Dept. of Justice, Civil Div., Washington, D.C., for Farm Credit Admin.

Alice E. Zaft, Cooley, Shrair, Springfield, Mass., Robert M. Kroenert, P. John Owen, Sarah W. Hays, Morrison, Hecker, Kansas City, Mo., for Farm Credit System.

Lester M. Bridgeman, Louis T. Urbanczyk, Miller, Hamilton, Washington, D.C., for amicus curiae Springfield and Texas Dist. Farm Credit Ass'ns.

Roger D. Redden, John A. MacColl, Paul A. Tiburzi, Piper & Marbury, Baltimore, Md., for amicus curiae Federal Land Bank of Baltimore.

John H. Vogel, Phillip L. Robinson, Patton, Boggs & Blow, Washington, D.C., for amicus curiae Federal Land Bank of Columbia.

Larry M. Hultquist, Farm Credit Banks of Sacramento, Sacramento, Cal., for amicus curiae Federal Land Bank of Sacramento.

William H. Rice, Asst. Atty. Gen., Montpelier, Vt., for amicus curiae State of Vt.

MEMORANDUM

FREEDMAN, Chief Judge.

I. INTRODUCTION

The Farm Credit System is a national network of federally-chartered farm lending institutions. In December 1985 Congress enacted the Farm Credit Amendments Act of 1985 ("1985 Amendments Act"), Pub.L. No. 99–205, 99 Stat. 1678, in response to a severe financial crisis gripping the Farm Credit System. The 1985 Amendments Act authorizes federal aid to the Farm Credit System, but only if necessary after the stronger Farm Credit Banks have assisted the weaker banks through compulsory, intra-System fund transfers. These "self-help" transfers are to be administered by a new federally-chartered entity, the Farm Credit System Capital Corporation ("Capital Corporation"), pursuant to regulations promulgated by the Farm Credit Administration ("FCA"). The FCA is the federal agency responsible for regulating the Farm Credit System.

This lawsuit challenges the regulations which the FCA subsequently promulgated in purported implementation of the "self-help" provisions of the 1985 Amendments Act. 51 Fed. Reg. 21332 (June 12, 1986), to be codified at 12 C.F.R. § 611.1142(h). Plaintiffs, six Farm Credit System institutions, argue that the regulations conflict with the 1985 Amendments Act, and that the regulations were adopted in violation of the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b), (c).[1] Plaintiffs seek a declaration that the regulations are unlawful, and an injunction against their enforcement until they are rewritten in compliance with the 1985 Amendments Act and the APA.

Defendants, the FCA and the Capital Corporation, maintain that the regulations are consistent with the 1985 Amendments Act. They concede that the regulations were promulgated without providing notice and opportunity for comment, but contend that there was "good cause" for waiving these procedural requirements. Moreover, defendants assert that the claims of five out of the six plaintiffs are not ripe for adjudication, and that this Court therefore

---

1. In their complaint, plaintiffs also alleged that the regulations violate the Taking and Due Process Clauses of the fifth amendment; however, plaintiffs no longer raise these allegations.

lacks subject matter jurisdiction over those plaintiffs' claims.

This matter is presently before the Court upon the plaintiffs' motion for summary judgment,[2] the FCA's cross-motion for partial summary judgment, and the Capital Corporation's cross-motion for summary judgment. For the reasons described below, the Court reluctantly concludes that the challenged regulations are procedurally and substantively invalid and therefore void. In addition, the Court finds that the claims of all six plaintiffs are ripe. The Court will allow plaintiffs' motion and will deny defendants' motions.

## II. LEGAL AND FACTUAL BACKGROUND

### A. The Farm Credit System

In 1916 Congress created the Farm Credit System, a national network of privately owned banks and associations providing credit to the nation's agricultural producers. In establishing this System, Congress sought to ensure that the nation's farmers and ranchers would have a continuing, dependable source of credit at competitive rates. The Farm Credit System has become essential to American agriculture; at the end of 1985, it had approximately $73 billion in outstanding loans, representing approximately one-third of all agricultural debt in the United States. Through the Farm Credit Act of 1971, Pub.L. No. 92-181, 85 Stat. 583 (codified as amended at 12 U.S.C. § 2001 *et seq.*), Congress modernized and consolidated farm credit law and reaffirmed its commitment to ensure a permanent system of credit responsive to the needs of agricultural producers. Subsequent amendments, including the 1985 Amendments Act, have been designed to maintain the utility of the System in a changing credit and farming environment.

The Farm Credit Administration examines, supervises, and regulates the Farm Credit System. The FCA does not, however, make, subsidize, insure, guarantee, service, restructure or foreclose upon System loans. Borrowers obtain credit directly through the approximately 450 banks and associations in the System.

There are twelve Farm Credit Districts in the United States. Each contains a Federal Land Bank ("FLB"), which makes long-term agricultural loans through Federal Land Bank Associations ("FLBAs"); a Federal Intermediate Credit Bank ("FICB"), which provides short and intermediate-term credit through Production Credit Associations ("PCAs"); and a Bank for Cooperatives ("BC"), which makes loans directly to cooperatives. Thus, a borrower who obtains a Farm Credit System loan does so through the local FLBA, PCA or BC in the borrower's district. Plaintiffs in this case are the FLBs, FICBs, and BCs of the Springfield and Texas Districts.

Farm Credit System members are owned and controlled, directly or indirectly, by their borrowers. Each borrower is required to purchase stock or participation certificates in the lending institution as a precondition to getting a loan. But although they are autonomous and locally-oriented, the Farm Credit System banks and associations are also interdependent and financially interrelated in a number of ways. Perhaps the most important tie binding together the System's institutions is the banks' joint and several liability on the Farm Credit System securities, which are the primary source of System financing. 12 U.S.C. § 2155. Financial assistance agreements between System members further reinforce System interdependence.

### B. Current Financial Crisis

The Farm Credit System is facing a severe financial crisis. Due to plummeting farmland values, the instability in the ex-

---

2. The following have filed briefs as *amici curiae* in support of plaintiffs' motion for summary judgment: Springfield and Texas Districts Farm Credit Associations; the Federal Land Bank of Baltimore, the Federal Intermediate Credit Bank of Baltimore, and the Baltimore Bank for Cooperatives; the Federal Land Bank of Colum-

bia, the Federal Intermediate Credit Bank of Columbia, and the Columbia Bank for Cooperatives; the Federal Land Bank of Sacramento, the Federal Intermediate Credit Bank of Sacramento, and the Sacramento Bank for Cooperatives; and the State of Vermont.

port market, expensive production costs, low commodity prices and high interest rates, American agriculture is in the midst of its worst depression since the 1930s. The impact of the agricultural depression upon the Farm Credit System has been devastating.

> During the third quarter of 1985, the 37 Farm Credit banks lost $552.5 million, the second largest loss ever recorded for any financial institution. The costs of carrying nonearning assets and provisions to absorb $3 billion or more in projected loan losses will result in multibillion dollar net operating losses in the System for the next several years. A stream of such bad news raises serious concern that investors may abandon the market for Farm Credit System securities.

H.R.Rep. No. 425, 99th Cong., 1st Sess. 7, *reprinted in* 1985 U.S.Code Cong. & Admin.News 2587, 2594.

The severity of the agricultural crisis varies in different regions of the nation. Due to a stronger farm economy, particularly in the Springfield District, and conservative lending practices in both districts, the Springfield and Texas Districts are currently among the strongest in the Farm Credit System. As of August 31, 1986, the Springfield banks and associations had total unallocated retained earnings[3] of $135 million; as of June 30, 1986, the Texas institutions had approximately $302 million in unallocated retained earnings. Reflecting their financial strength, during the past two years the Springfield and Texas banks have provided approximately $120 million in financial aid to beleaguered Farm Credit System members, pursuant to voluntary intra-System capital preservation agreements. These contributions have reduced plaintiffs' unallocated retained earnings and have raised plaintiffs' lending rates.

---

**3.** Unallocated retained earnings equals net worth less (1) the par value of capital stock and (2) undistributed earnings that have been allocated to an institution's members or patrons.

**4.** Congress recently enacted further amendments to the Farm Credit Act of 1971. Farm Credit Act Amendments of 1986, Pub.L. No. 99–509, §§ 1031–37, 100 Stat. 1874, 1877–79. In part, this legislation permits Farm Credit Sys-

## C. The 1985 Amendments Act

Responding to the financial crisis afflicting the Farm Credit System, Congress passed the 1985 Amendments Act.[4] President Reagan signed this legislation into law on December 23, 1985. The 1985 Amendments Act authorizes a "backup" federal line of credit for the Farm Credit System, to be furnished only if necessary after the resources of the stronger System institutions have been tapped through a "self-help" mechanism established to provide assistance to the weaker institutions.

To implement this "self-help" mechanism, Congress directed the FCA to charter the Farm Credit System Capital Corporation, not later than sixty days after the enactment of the 1985 Amendments. Section 4.28A(1) of the Farm Credit Act of 1971, as amended by section 103 of the 1985 Amendments Act, 12 U.S.C. § 2216(1). Congress authorized the Capital Corporation to "require other institutions of the Farm Credit System, through purchase of stock in, or obligations of, the Capital Corporation, to make funds available to the Capital Corporation to enable it to make financial assistance available to institutions of the Farm Credit System as provided in [section 4.28G(a)(15)]." Section 4.28G(a)(14), 12 U.S.C. § 2216f(a)(14). Under section 4.28G(a)(15), the Capital Corporation is to "administer financial assistance under regulations" to be promulgated by the FCA. These regulations must:

> (A) include standards to ensure that, consistent with sound business practices and subject to the criteria established under subparagraph (B) of this paragraph, the available capital and reserves of System institutions are committed to providing financial assistance to those institutions of the Farm Credit System

---

tem institutions to change their accounting procedures to allow amortization of current losses over a period not to exceed twenty years. Congress intended this provision as a supplement to the 1985 Amendments Act. *See* H.R.Conf.Rep. No. 1012, 99th Cong., 2d Sess. 230, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3607, 3868, 3875.

eligible therefor. The term 'available capital and reserves,' as used in this subparagraph, shall not include capital stock, participation certificates and allocated equities held by borrowers that are not associations chartered under this Act;

(B) establish criteria pursuant to which the Capital Corporation shall require other institutions of the Farm Credit System, through the purchase of stock in, or obligations of, the Capital Corporation to make funds available to the Capital Corporation under paragraph (14). Such criteria shall—

(i) provide for an equitable sharing of the burden of such assessments or purchases, taking into account (I) the relative financial strength and ability to pay of the contributing institutions; (II) the effect, including the effect on loan interest rates, on current borrowers and members of each System institution; and (III) the effect on lending rates of financial assistance already provided to other System institutions; and

(ii) be designed to ensure that (I) the capital strength, earning capacity, loanable funds and overall financial viability of each System institution providing funds to the Capital Corporation are maintained at such a level that credit shall continue to be available to eligible borrowers on reasonable and competitive terms, (II) each bank shall continue to have access to funds in the public financial markets, and (III) each bank is able to maintain adequate financial resources to satisfy its liability on its own obligations and on that portion of systemwide notes, bonds, debentures, or other obligations for which it is primarily liable....

Section 4.28G(a)(15); 12 U.S.C. § 2216f(a)(15).

If System "self-help" remedies fail to alleviate the financial crisis, then the Secretary of the Treasury may, in his or her discretion, purchase obligations issued by the Capital Corporation to provide funds to be used to assist the Farm Credit System. Section 4.28J(a), 12 U.S.C. § 2216i(a). As

conditions of such purchases, Congress required certification by the FCA that:

(1) the Farm Credit System is in need of financial assistance to address financial stress of System institutions, (2) the System has committed its available capital surplus and reserves to address such financial stress of System institutions, (3) the salaries and benefits of the senior executive officers of System institutions (except associations) will be frozen, ... and (4) the System has used such capital surplus and reserves to the extent that further contributions from, or losses incurred by, System institutions likely will preclude such institutions from making credit available to eligible borrowers on reasonable terms....

*Id.*

### D. The Implementation of the 1985 Amendments Act

In passing the 1985 Amendments Act, Congress had expressed its sense "that the pressing needs of the Farm Credit System and the United States agricultural industry require the implementation of this Act as soon as practicable." 1985 Amendments Act § 403, 99 Stat. 1678, 1710. On February 14, 1986 the FCA issued Capital Directive No. 1, establishing guidelines for minimum levels of capitalization for all System banks and associations and protecting against the dissipation of System resources. On February 24, 1986 the FCA chartered the Farm Credit System Capital Corporation. The FCA promulgated on March 10, 1986 regulations governing the organization, operation and capitalization of the Capital Corporation, and standards under which Farm Credit System institutions may be eligible for financial aid under the 1985 Amendments Act. Plaintiffs challenge neither Capital Directive No. 1 nor the March regulations.

On June 12, 1986 the FCA promulgated the regulations required by section 4.28G(a)(15) of the 1985 Amendments Act, establishing criteria for required purchases of Capital Corporation obligations and assessments by the Capital Corporation. 51 Fed. Reg. 21332, to be codified at 12 C.F.R.

§ 611.1142(h). It is these regulations that plaintiffs challenge.

The relevant portions of the June regulations are as follows.

The FCA defines the assets subject to assessment by the Capital Corporation—an institution's "available capital and reserves"—as (in most cases) being equivalent to an institution's "unallocated retained earnings." 12 C.F.R. § 611.1142(h)(1)(iii). "Unallocated retained earnings" is itself defined as "the undistributed earnings of an institution that have not been allocated to the institution's members or patrons." Section 611.-1142(h)(1)(viii). This represents the surplus earnings of an institution, less capital stock, participation certificates, allocated equities and an allowance for loan losses. *See* Needham affidavit ¶ 7.

An institution's "unallocated retained earnings percentage" is calculated by dividing its unallocated retained earnings by its total assets. Section 611.1142(h)(1)(ix). This percentage is then used to place the institution in one of four "zones," dubbed "Zone A" through "Zone D," which have been developed by the FCA. System members falling in Zone A are the financially strongest members of the Farm Credit System. Those in Zone B have substantial unallocated retained earnings, but less than Zone A institutions. Institutions in Zone C have still less unallocated retained earnings, and those in Zone D are at the threshold level of capital stock and allocated earnings, with very little unallocated retained earnings. *See* section 611.1142(h)(5); Appendix 1 to section 611.1142(h); Needham affidavit ¶¶ 6–13.

The heart of the June regulations is contained in section 611.1142(h)(6), entitled "Funding Criteria." This section provides:

> To the extent necessary to fund its purchase of assets from System institutions and to enable the [Capital] Corporation to extend direct financial assistance to eligible institutions, the Corporation shall assess or require System institutions to purchase obligations to the full extent of their available capital and reserves, as defined in this subpart. In

equitably distributing the burden of such assessments as they are made from time to time, the Corporation shall require institutions which ... are classified in Zone A, B, or C to provide funds to the Corporation, prior to making assessments of or requiring the purchase of obligations by institutions classified in Zone D. The Corporation shall take into consideration the criteria contained in paragraphs (h)(6)(i) through (iii) of this section, provided that nothing in this paragraph shall prevent the Corporation from assessing or requiring an institution to purchase obligations when it has available capital and reserves.

(i) The Corporation shall consider the effect that obtaining funds will have on the institution's loan rate. Any assessments and purchases of obligations shall be deemed to have no effect on the lending rates of the following institutions that either have sufficient resources to pay assessments and purchase obligations without raising their interest rates or that charge rates below the average loan rates of similar institutions:

(A) Institutions classified in Zone A or B; and

(B) Institutions classified in Zone C that charge an average loan rate, based on the most recent quarterly financial statement, that is below the weighted average loan rate charged by all institutions chartered under the same title of the Act and classified in Zone C.

(ii) The Corporation shall ensure that the earnings capacity, loanable funds, and overall financial viability of an institution providing funds to the Corporation are not reduced by such action below the level necessary to enable the institution to provide credit to eligible borrowers on reasonable and competitive terms. Any assessment or required purchase of obligations shall be deemed to have no impact on an institution for purposes of this paragraph if such institution has a positive level of adjusted loanable funds.

(iii) The Corporation shall ensure that System banks that provide funds to the Corporation retain their ability to obtain

funds in public financial markets and to satisfy their individual liability on obligations. Any assessment or required purchase of obligations shall be deemed to have no impact on an institution for purposes for this paragraph if the institution is able to satisfy the collateral requirements contained in section 4.3 of the Act.

In issuing the June regulations, which were effective the day after publication, the FCA provided neither prior notice nor opportunity for public comment.[5] The FCA gave the following explanation for its decision to forego notice and comment:

> The agency has determined that in light of the congressional directive in the [1985 Amendments Act] that the [Capital] Corporation be chartered within 60 days of the enactment of the 1985 Amendments and be operational as soon as possible thereafter, public notice and publication for comment are impracticable, unnecessary, and contrary to the public interest.

51 Fed. Reg. 21334.

On August 27, 1986 the Capital Corporation issued a preliminary notice of proposed assessment and required purchase of obligations to all Farm Credit System banks and associations, and requested specific financial data to determine each institution's level of contribution, *i.e.*, each institution's zone classification. Plaintiffs commenced this action shortly thereafter.[6] On September 15, 1986, the Capital Corporation issued a final notice of assessment and required purchase of obligations to certain System members. The total required purchase of obligations and assessments was approximately $300 million; of this amount, 99.5% was for required purchase of Capital Corporation obligations, with the remaining 0.5% assessed for Capital Corporation operating expenses. Of the six plaintiffs, however, only one—Texas Bank for Cooperatives—received a final notice of assessment and required purchase of obligations. Texas BC's share of the total assessment was $6,444,725. None of the remaining five plaintiffs—Federal Land Bank of Springfield, Federal Intermediate Credit Bank of Springfield, Springfield Bank for Cooperatives, Federal Land Bank of Texas and Federal Intermediate Credit Bank of Texas —were assessed or required to purchase obligations by the Capital Corporation.

## III. ANALYSIS

### A. Jurisdiction and Venue

Plaintiffs bring this action pursuant to section 5.18(a)(13) of the Farm Credit Act of 1971, 12 U.S.C. § 2252(a)(13), as added by section 201 of the 1985 Amendments Act; the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and 28 U.S.C. § 1331. Venue is proper in this district under 28 U.S.C. § 1391(b), (c), and (e).

### B. Ripeness

█ The defendants have raised a threshold issue of ripeness. They maintain that this Court should dismiss this case with respect to the five plaintiffs which have not received a final notice of assess-

---

5. On August 18, 1986 the plaintiffs, together with the FLBAs and PCAs in the Springfield District, submitted to the FCA comments arguing that the regulations violated the 1985 Amendments Act and the Administrative Procedure Act.

6. This is one of several lawsuits brought nationwide challenging the June regulations, and, in some cases, the 1985 Amendments Act as well. *Compare Federal Land Bank of Baltimore v. Farm Credit Admin.*, No. H–86–3137, slip op. (D.Md. Oct. 31, 1986) (preliminary injunction entered); *Sikeston Production Credit Ass'n v. Farm Credit Admin.*, 647 F.Supp. 1155 (E.D.Mo., 1986) (permanent injunction entered); *Caprock–Plains Federal Land Bank Ass'n of Plainview v. Farm Credit Admin.*, No. CA–5–86–202, slip op. (N.D.Tex. Oct. 16, 1986 & Oct. 10, 1986) (preliminary injunction entered); *Colorado Springs Production Credit Ass'n v. Farm Credit Admin.*, No. 86–K–1948 (Sept. 26, 1986) (TRO entered) *with Northwest Louisiana Production Credit Ass'n v. Farm Credit Admin.*, No. 86–3164, slip op. (W.D.La. Oct. 16, 1986) (TRO denied); *Production Credit Ass'n of Eastern New Mexico v. United States*, No. 86–1137 JC, slip op. (D.N. M. Oct. 10, 1986) (preliminary injunction denied); *Central Kentucky Production Credit Ass'n v. United States*, No. 86–2056, slip op. (D.D.C. Oct. 3, 1986) (TRO vacated and preliminary injunction denied); *Great Plains Production Credit Ass'n v. Farm Credit Admin.*, No. 86–2119–A (Oct. 3, 1986) (preliminary injunction denied).

ment and required purchase from the Capital Corporation. The claims of these plaintiffs, defendants assert, are not ripe; hence, this Court lacks subject matter jurisdiction over these five plaintiffs.

In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and its two companion cases, *Toilet Goods Association, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), and *Gardner v. Toilet Goods Association, Inc.,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), the Supreme Court outlined the ripeness doctrine in the context of judicial review of administrative action. The "basic rationale" of the ripeness doctrine, the Supreme Court stated, "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. at 1515–16. A court's role, when faced with a ripeness challenge, is "to evaluate both the fitness of the issues for judicial decision and hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.

There are two key factors in determining fitness of an issue for judicial decision: whether the issue is "purely legal," *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515, and whether the challenged action is a "final agency action" under the Administrative Procedure Act. *Id.* The defendants do not contest that the FCA's promulgation of the June regulations was a "final agency action" under the APA; their argument that the non-assessed plaintiffs' claims are not fit for judicial decision focuses on whether the issues presented are "purely legal."

The Court finds that the procedural validity of the June regulations is an issue fit for judicial decision as to all six plaintiffs. That five plaintiffs have not yet been as-

sessed is immaterial to the legality of the FCA's waiver of notice and comment—a "purely legal" question. *Cf. Standard Oil Company v. Department of Energy,* 596 F.2d 1029, 1039 (Temp.Emer.Ct.App.1978) (challenge to procedures followed by Federal Energy Administration in adopting regulations held "purely legal"). Also "purely legal" is the substantive issue presented to this Court, *i.e.,* the June regulations' consistency with the 1985 Amendments Act. *Cf. Caprock–Plains Federal Land Bank Association v. Farm Credit Administration,* No. 5–85–267, slip op. at 6 (N.D.Tex. March 11, 1986) [Available on WESTLAW, 1986 WL 20443] (holding ripe substantive challenge to predecessor Farm Credit System fund transfer regulation, 12 C.F.R. § 611.1145 (1985), even though challengers had not been assessed).

In determining the hardship which would result to the parties by withholding judicial review, this Court must inquire whether "the impact of the regulations upon the [plaintiffs which have not been assessed] is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Laboratories,* 387 U.S. at 152, 87 S.Ct. at 1517.

The June regulations have had sufficient impact upon all six plaintiffs to render judicial review appropriate at this time. As the FCA itself emphasizes, "the System's banks and associations function together as interdependent and financially interrelated cooperatives." Memorandum in Support of Federal Defendant's Cross–Motion for Partial Summary and in Opposition to Plaintiffs' Motion for Summary Judgment at 6. The September 1986 Capital Corporation assessment and required purchase totalling $300 million has surely had a significant impact upon *all* Farm Credit System members—even those institutions which have not themselves been assessed.[7] Postponing judicial review for an indeterminate time would likely have an adverse effect upon the plaintiffs; on the other hand, adjudicating now all six plaintiffs' claims will have no foreseeable adverse impact upon the defendants.

---

7. Indeed, the FCA's own financial analyst acknowledges that "[t]he Capital Corporation as-

sessments will undoubtedly impact plaintiffs' financial position." Needham affidavit ¶ 62.

Plaintiff Texas BC's claims are ripe. It would be pointless to adjudicate Texas BC's allegations that the regulations are invalid while denying the same adjudication to the other five plaintiffs. Such an approach would "fl[y] directly in the face of efficient judicial administration." *Independent Bankers Association of America v. Smith,* 534 F.2d 921, 928 (D.C.Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed. 2d 141 (1976). It would frustrate both the principles set forth in *Abbott Laboratories* and common sense.

### C. Procedural Invalidity

1. No Good Cause for Waiver of Notice and Comment Requirements

Plaintiffs allege that in promulgating the June regulations, the FCA violated the Administrative Procedure Act's requirements of prior notice and an opportunity for comment. 5 U.S.C. § 553.[8] Defendants acknowledge non-compliance with the notice and comment requirements of section 553. They maintain that the June regulations were nevertheless promulgated in accordance with law. Defendants rely on section 553(b)(B), which authorizes an exception to the APA's notice and comment requirements, "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Thus, the procedural question before this Court is whether the FCA had "good cause" under section 553(b)(B) to waive the APA's notice and comment requirements.

Good cause for waiver of the APA's notice and comment requirements "is narrowly construed." *Levesque v. Block,* 723 F.2d 175, 184 (1st Cir.1983); *Kollett v. Harris,* 619 F.2d 134, 145 (1st Cir.1980).

"Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. "Unnecessary" means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. "Public interest" supplements the terms "impracticable" or "unnecessary"; it requires that public rule-making procedures shall not prevent an agency from operating and that, on the other hand, lack of public interest in rule-making warrants an agency to dispense with public procedure.

S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945), *reprinted in* Senate Judiciary Committee, 79th Cong., 2d Sess., Administrative Procedure Act Legislative History 185, 200 (1946), *quoted in Kollett,* 619 F.2d at 145.

It cannot be said in this case that notice and comment were "unnecessary" or "contrary to the public interest," as these terms are defined. If there was good cause for the FCA's waiver of notice and comment, it was because these procedures were "impracticable."

Plaintiffs contend that the defendants have not met their burden of establishing good cause for waiver of notice and comment. Plaintiffs recognize, as they must,

---

**8.** The APA states, in relevant part:

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
> (1) a statement of time, place, and nature of public rule making proceedings;
> (2) reference to the legal authority under which the rule is proposed; and
> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved....
> (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise statement of their basis and purpose....

5 U.S.C. § 553.

"[T]he purpose of prior notice and comment is to afford persons an opportunity to influence agency action in the formative stage, before implementation, when the agency is more likely to be receptive to argument." *Kollett v. Harris,* 619 F.2d 134, 145 (1st Cir.1980).

that the Farm Credit System is facing a severe financial crisis. But, plaintiffs note, although Congress imposed a specific deadline for chartering the Capital Corporation, Congress did *not* require that the compelled transfer regulations be promulgated by a date certain. The FCA had ample opportunity to provide prior notice and accept public comments during the nine months between the passage of the 1985 Amendments Act and the actual implementation of the June regulations. At the very least, the FCA could have complied with section 553 during the spring of 1986, when the FCA was making a series of computer analyses in preparation of the June regulations,[9] by simply publishing a "description of the subjects and issues involved."

Defendants argue that the Farm Credit System crisis fully justified the FCA's waiver of notice and comment. The June regulations were promulgated during and for this genuine national emergency. They were an essential prerequisite to the Capital Corporation's statutory mission—which Congress said should be implemented "as soon as practicable." The FCA chartered the Capital Corporation within its sixty-day deadline, and immediately thereafter issued regulations governing the Capital Corporation's organization and operation. The FCA then began developing the June regulations by conducting a series of computer analyses; it concurrently developed and implemented additional sets of regulations required by the 1985 Amendments Act. Given the critical and the complex tasks facing the FCA and the Capital Corporation, defendants maintain that it was impracticable for the FCA to comply with section 553's procedural requirements.

The Court finds plaintiffs' argument more persuasive than defendants'. The FCA's due and required implementation of the 1985 Amendment Act would *not* have been unavoidably prevented had it provided prior notice and opportunity for comment. In passing the 1985 Amendments Act in December 1985, Congress did nothing to suggest that the FCA should waive notice and comment. Even had Congress set a specific deadline for the promulgation of the compelled transfer regulations—as it did for chartering the Capital Corporation[10]—short statutory time constraints are not talismanic. *See Levesque v. Block, supra,* 723 F.2d at 180; *Kollett v. Harris, supra,* 619 F.2d at 145. The FCA could have and should have complied with APA § 553 in the spring of 1986.

Many of the cases upon which defendants rely involve agencies confronted with emergencies to which *immediate* response was necessary. Courts have found good cause for waiver of notice and comment in such circumstances where agencies promulgated *interim* or temporary rules. For example, in *American Federation of Government Employees, AFL–CIO v. Block,* 655 F.2d 1153 (D.C.Cir.1981), the Department of Agriculture had two weeks to respond to a court order. The circuit court held that although there was good cause for waiver of notice and comment in promulgating the agency's temporary regulations, the same was not true for the agency's *permanent* regulations. The court stated:

> Common sense suggests that any administrative action taken in a rare "emergency" situation ... while perhaps necessarily "immediately effective," need only be temporary, pending public notice-and-comment procedures. *Valiant Steel and Equipment, Inc. v. Goldschmidt,* 499 F.Supp. 410, 412–13 (D.D.C.1980). Here, however, we hold only that detailed regulations which respond—as these do—to much more than the exigencies of the moment must be promulgated through public procedures before they are chiseled into bureaucratic stone. Although in this case much study had ap-

---

**9.** These computer analyses are contained in the Administrative Record.

**10.** In section 403 of the 1985 Amendments Act, Congress expressed not only its sense that the needs of the Farm Credit System and American agriculture required that the Act be implement-

ed "as soon as practicable," but also its sense that "the President should ensure that the members of the Farm Credit Administration Board ... are appointed not later than thirty days after enactment of this Act." Congress knows how to set specific deadlines when it so desires.

parently been done prior to the publications of the regulations, such preparedness may not characterize future situations. Therefore, once an emergency situation has been eased by the promulgation of interim rules, it is crucial that the comprehensive permanent regulations which follow emerge as a result of the congressionally-mandated policy of affording public participation that is embodied in section 553.

655 F.2d at 1157–58 (footnotes omitted). *See also Petry v. Block*, 737 F.2d 1193, 1200–03 (D.C.Cir.1984) (combination of several extraordinary factors, including extremely limited statutory deadlines for promulgation of regulations and paucity of agency personnel, provided good cause for waiver of notice and comment in promulgation of interim rules); *American Transfer & Storage Co. v. Interstate Commerce Commission*, 719 F.2d 1283, 1293–94 (5th Cir.1983) (current backlog and future flood tide of cases supported promulgation of interim regulations without notice and comment; public input had been invited before final regulations were issued); *National Federation of Federal Employees v. Devine*, 671 F.2d 607, 610–12 (D.C.Cir.1982) (emergency constituted good cause for waiver of notice and comment in promulgating interim rules, where events and circumstances beyond agency's control were not foreseen in time to comply with notice and comment procedures).

In this case, of course, the challenged regulations are not interim, but final.

The Court holds that the FCA did not have "good cause" for waiving the APA's requirements of prior notice and opportunity for comment. The June regulations are procedurally invalid.

### 2. Remedy

Defendants request that this Court nevertheless allow the regulations to stand as valid "interim" rules, pending repromulgation in accordance with the APA. An injunction against enforcement of the June regulations, defendants maintain, would be contrary to the public interest.

Interim rules have been allowed to stand, despite procedural deficiencies, principally to preserve the status quo or to prevent injury to those challenging the regulations until the agency can issue procedurally valid permanent regulations. *See American Federation of Government Employees, AFL–CIO v. Block, supra*, 655 F.2d at 1157 (emergency interim regulations allowed to stand so that federal poultry inspections could continue); *Western Oil & Gas Association v. Environmental Protection Agency*, 633 F.2d 803, 812–13 (9th Cir.1980) (court desires to minimize intervention in complex environmental regulation); *Rodway v. Department of Agriculture*, 514 F.2d 809, 817–18 (D.C.Cir.1975) (critical importance of regulations to continued functioning of food stamp program); *Valiant Steel & Equipment, Inc. v. Goldschmidt*, 499 F.Supp. 410, 414 (D.D.C.1980) (two-year old emergency regulations allowed to stand for additional thirty days to ensure functioning of federal highway program; court notes that plaintiff waited over eighteen months before filing suit). But the case *sub judice*, allowing the June regulations to remain in effect as interim rules would neither preserve the status quo nor protect plaintiffs. The Capital Corporation would be free to *alter* the status quo to plaintiffs' detriment, by enforcing the assessment already made against plaintiff Texas Bank for Cooperatives, and by exacting additional compelled transfers against Texas BC and the other five plaintiffs.

On the other hand, the Court must carefully consider the possible impact that immediately enjoining the June regulations might have upon the Farm Credit System, and, by extension, upon American agriculture. At the December 30, 1986 oral argument, the Court inquired counsel about this possibility. Counsel for the FCA replied that a ruling for plaintiffs could seriously deepen the financial crisis in the Farm Credit System. *See* Transcript at 33–34. But counsel for plaintiffs asserted that Congress' recent authorization of modification of the System's accounting practices, allowing deferment of losses for up to twenty years, "will have the effect … of at least postponing the evil day." *Id.* at 56.

The Capital Corporation subsequently filed an affidavit of Richard T. Needham, its Vice–President and Controller. Needham explains in this affidavit that the new accounting methods will not be "a panacea for the System's difficulties." Needham Affidavit ¶ 8. The the contrary, Needham states, the new accounting will actually "compound the difficulties failing System institutions will face in January, February and March of 1987." *Id.* ¶ 7. More importantly, Needham estimates that the uncommitted resources currently held by the Capital Corporation with which it can assist troubled System institutions "will not be sufficient to satisfy the financial assistance needs of System institutions through the first quarter of 1987." *Id.* ¶ 9.

The Court takes Needham's affidavit very seriously. Were the June regulations only procedurally invalid, the Court would allow the regulations to stand as interim rules, pending re-promulgation in conformity with the APA. But because the Court also holds that the regulations are substantively invalid, subpart D, *post*, the Court cannot permit the regulations to stand even as interim rules.

### D. Substantive Invalidity

#### 1. Standard of Review

■■■ In order to be substantively valid, a regulation must be consistent with the statute under which it has been promulgated. *E.g., United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977). Defendants urge the Court, in reviewing the June regulations' consistency with the 1985 Amendments Act, to give substantial deference to the FCA's interpretation of the Act. But deference to an agency's interpretation of a statute which it is charged with implementing is not permissible if Congress has spoken directly to the precise point in issue.

*Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, ——, 106 S.Ct. 2860, 2867, 92 L.Ed.2d 166, 180 (1986); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). *See also St. Luke's Hospital v. Secretary of Health and Human Services*, 810 F.2d 325, 331 (1st Cir.1987) (deference to agency's interpretation of statute inappropriate where statute is unambiguous).[11]

■■ Here, Congress could hardly have spoken more directly to the point: Section 4.28G(a)(15) of the Farm Credit Act, as amended by the 1985 Amendments Act, clearly and unambiguously prescribes the criteria which the FCA's compelled transfer regulations must include; section 4.28J(a) plainly sets out the four prerequisites to discretionary federal aid. Thus, the FCA's interpretation of the statute is entitled to no special deference.

#### 2. Plaintiffs' Substantive Claims

Plaintiffs mount a multi-prong substantive attack on the June regulations. First, plaintiffs assert that the regulations' three "deeming" presumptions nullify their *pro forma* recital of the statutory criteria. Second, plaintiffs contend that the regulations compound this nullification by providing that "nothing ... shall prevent the Corporation from assessing or requiring an institution to purchase obligations when it has available capital and reserves." Section 611.1142(h)(6). Third, plaintiffs argue that the regulations fail to comply with the statutory command to include criteria taking into account "the effect on lending rates of financial assistance already provided to other System institutions." Section 4.28G(a)(15)(B)(i)(III). We turn now to each of these three claims.

**11.** When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative determination. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron, supra,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted).

(a)

■ Section 4.28G(a)(15)(B)(ii)(I) of the Farm Credit Act, as amended by the 1985 Amendments Act, requires included in the FCA's compelled transfer regulations criteria which "ensure" that "the capital strength, earning capacity, loanable funds and overall financial viability of each System institution providing funds to the Capital Corporation are maintained at such a level that credit shall continue to be available to eligible borrowers on reasonable and competitive terms." The June regulations "deem" that "[a]ny assessment or required purchase" will have "no impact" on credit terms, whenever a transferor institution "has a positive level of adjusted loanable funds." Section 611.1142(h)(6)(ii). The FCA defines "loanable funds" as interest-accruing assets less interest-bearing obligations. Section 611.1142(h)(1)(vi). "Adjusted loanable funds" is defined as "loanable funds adjusted by an amount representing the proceeds which the institution could receive from sale of all loans and acquired property eligible to be sold to the Corporation." Section 611.1142(h)(1)(i).[12]

Sections 4.28G(a)(15)(B)(ii)(II) and (III) of the statute require included in the regulations criteria which "ensure" that each transferor institution "shall continue to have access to funds in the public financial markets," and be "able to maintain adequate financial reserves to satisfy its liability on its own obligations and on that portion of systemwide ... obligations for which it is primarily liable." Under the June regulations, "[a]ny assessment and required purchase" is "deemed" to have "no impact" on an institution's access to funds and ability to satisfy its liabilities, "if the institution is able to satisfy the collateral requirements of section 4.3 of the Act [12 U.S.C. § 2154]." Section 611.-1142(h)(6)(iii).

Finally, in section 4.28G(a)(15)(B)(i)(II), Congress mandated the inclusion of criteria which take into account "the effect, including the effect on loan interest rates, on current borrowers and members of each System institution." Once again, the June regulations "deem" that "[a]ny assessments and purchases" will have "no effect" on the lending rates of all Zones A and B institutions and of those Zone C institutions which charge interest rates below the average rate charged by all Zone C institutions. Section 611.1142(h)(6)(i).

Defendants maintain that these three "deeming" presumptions rationally implement the statute, construed in light of the critical situation facing the Farm Credit System and the resulting need for prompt, decisive remedial action. Moreover, defendants explain, the actual operation of the presumptions depends in each specific case upon the prior placement of each individual transferor institution according to the FCA's zone classification. This classification, in turn, is determined by an institution's particular financial circumstances. The combination of the individual zone classifications and the prerequisites for the application of the presumptions ensures, defendants argue, that both the financial strength of each transferor and the impact of an assessment and required purchase are accurately measured in compliance with the statute.

Each of the three "deeming" presumptions—standing alone—might be acceptable, although plaintiffs' challenges to each individual are strong. But the Court must construe the regulations in its entirety. So construed, the June regulations "deem" away almost all of the statutory criteria for assessments and purchases made *in any amount*. The zone classification may determine the *order* in which institutions are assessed,[13] but does not limit or condition the *magnitude* of such assessments.

---

**12.** The regulations further state,

These adjustments shall be equal to 80 percent of the book value of loans and acquired property eligible for sale to the Corporation, provided that such amount shall not exceed the amount that would cause the institution's unallocated retaining earnings percentage to fall below the level required for classification as a Zone C institution if the institution sold eligible loans and acquired property to the Corporation.

*Id.*

**13.** Due to the zone classification, the June regulations take into account "the *relative* financial

The Court appreciates the urgency of the Farm Credit System's fiscal crisis, and recognizes that Congress required that strong institutions must make sacrifices to help save the weak. But Congress also directed the FCA to develop specific, detailed criteria to prevent the "self-help" mechanism from destroying the financial viability of healthy institutions. The June regulations' three "deeming" presumptions, taken together, do not comply with this direction.

(b)

Any doubt about the substantive invalidity of the June regulations dissolves upon addressing plaintiffs' next claim. Section 611.1142(h)(6) of the June regulations states, that as necessary to fulfill its mission, the Capital Corporation "shall assess or require System institutions to purchase obligations to the full extent of their available capital and reserves."[14] In so doing, the "Corporation shall take into consideration the criteria contained in paragraphs (h)(6)(i) through (iii) of this section." *Id.* But, the regulations further provide, "*nothing* contained in this paragraph shall prevent the Corporation from assessing or requiring an institution to purchase obligations when it has available capital and reserves." *Id.* (emphasis supplied). Thus, the regulations expressly allow the Capital Corporation to take *all* of an institution's "available capital and reserves" *in complete disregard* of the statutory criteria purported incorporated into the regulations. This, plaintiffs maintain, is plainly lawless.

In defense of its regulation, the FCA argues that the 1985 Amendments Act itself is internally contradictory, and that the June regulations properly resolve the statute's contradiction.[15] Specifically, the FCA contends that section 4.28J(a)(2), which requires FCA certification that the Farm Credit System must have "committed its available capital surplus and reserves to

address" its financial crisis before discretionary federal aid is available, conflicts with the required criteria set forth in section 4.28G(a)(15)(B). The June regulations resolve this contradiction, the FCA explains, by providing a two-step assessment process. First, the Capital Corporation may only assess institutions which are classified in Zones A, B or C. These assessments must comply with the regulatory limitations on positive adjusted loanable funds, interest rate determinations, and collateral requirements. But, once all System institutions have fallen to the bottom of Zone C or into Zone D, to qualify for federal aid the Capital Corporation must assess *all* of the System's remaining "available capital and reserves." To do this, the Capital Corporation must be free from the protections afforded to transferor institutions in sections 411.1142(h)(6)(i), (ii), and (iii).

The FCA's premise that the statute is internally contradictory results from a rather selective myopia. The statutory prerequisites to discretional federal aid must be read together. In particular, section 4.28J(a)(2), the prerequisite which supposedly contradicts the requirement that the regulations implement specified protective criteria, must be reconciled with section 4.28J(a)(4). Therein, Congress states that federal aid is predicated upon FCA certification that "the System has used such capital surplus and reserves *to the extent that further contributions from, or losses incurred by, System institutions likely will preclude such institutions from making credit available to eligible borrowers on reasonable terms.*" (Emphasis supplied).

Moreover, both sections 4.28J(a)(2) and (4) must be read in light of section 4.28G(a)(15)(A). Congress provides therein that the FCA's compelled transfer regulations must "include standards to ensure

---

strength and ability to pay of the contributing institutions." Section 4.28G(a)(15)(B)(i)(I) (emphasis supplied).

**14.** As stated earlier, the regulations define "available capital and reserves" to exclude capital stock, participation certificates, allocated equities, and loan loss reserves.

**15.** The Capital Corporation does not adopt the FCA's theory that the statute is self-contradictory. The Court takes this opportunity to note that the Capital Corporation's assertion that the statute requires mere non-binding "guidelines" is completely without merit.

that, *consistent with sound business practices and subject to the criteria established under subparagraph (B) of this paragraph,* the available capital and reserves of System institutions are committed to providing financial assistance. . . ." (Emphasis supplied).

Reading the statute as a whole, and considering the clearly expressed Congressional intent that viable Farm Credit System institutions not be ruined by the Capital Corporation's assessments, the Court holds that the statutory "commitment" prerequisite to federal aid is satisfied when compelled transfers *reach* the "reasonable and competitive" credit term limit, *i.e.,* when available credit and reserves have been "used" to that extent. *The Capital Corporation may not assess beyond this point.* Congress did not authorize the Capital Corporation to overrule the "reasonable and competitive" credit term criterion, or any of the other required criteria. By permitting this, the June regulations directly contradict the Act.

The Report of the House Agricultural Committee corroborates this holding. In its introduction to the Farm Credit System "self-help" scheme, the Report states that the Capital Corporation's levies may not "reach a point at which the financial viability of local institutions would be imperiled, or at which local institutions would be left unable to make credit available to borrowers on reasonable and competitive terms." H.R.Rep. No. 425, *supra* at 2, *reprinted in* 1985 U.S.Code Cong. & Admin.News p. 2587 at 2588. In outlining how the bill's "mechanism for discretionary backstop aid from the federal government" would operate, the first requirement noted in the Report is FCA certification "that the System needs financial assistance and has committed its own available capital surplus and reserves to the point where a further drain on System resources would probably leave its institutions unable to serve their borrowers on reasonable terms." *Id.* at 4, *reprinted at* 2590–91.

(c)

Finally, Congress also required included in the FCA's compelled transfer regula-

tions criteria taking into account "the effect on lending rates of financial assistance already provided to other System institutions." Section 4.28G(a)(15)(B)(i)(III). Plaintiffs allege that the June regulations ignore this command.

The regulations do not explicitly include criteria accounting for the effect of prior assistance on transferors' loan rates. But, the FCA argues, the zone classification scheme implicitly incorporates such criteria. Each institution's zone classification is determined by its unallocated retained earnings percentage, which is a function of the institution's amount of unallocated retained earnings. An institution's unallocated retained earnings will be less if it has made prior financial contributions.

The FCA's argument is unpersuasive. Zone classifications are determined solely upon the percentage relation between an institution's unallocated retained earnings and its total assets. The FCA has failed to persuasively explain how an institution's unallocated retained earnings percentage has any particular relation to the magnitude of its prior voluntary assistance, its loan interest rates, and the effect its prior assistance has had upon its loan rates. All that the FCA demonstrates is that an institution that has made voluntary contributions will have less unallocated retained earnings than it would otherwise.

## IV. CONCLUSION

There is no genuine issue as to any material fact. The claims of all six plaintiffs are ripe. The June regulations were promulgated in violation of the notice and comment requirements of the Administrative Procedure Act. The June regulations conflict with the 1985 Amendments Act.

The June regulations are procedurally and substantively invalid and are therefore void.

An appropriate Order shall issue.

## ORDER

For the reasons stated in the accompanying Memorandum issued this date, the Court DECLARES:

1) that the regulations adopted by the Farm Credit Administration at 51 Fed.Reg. 21332 (June 12, 1986), to be codified at 12 C.F.R. § 611.1142(h), are contrary to section 4.28G(a)(15) of the Farm Credit Act, and thus are invalid;

2) that said regulations were adopted in violation of the rule-making requirements of the Administrative Procedure Act, 5 U.S.C. § 553, and thus are invalid; and

3) that any required purchases or assessments imposed pursuant to 12 C.F.R. § 611.1142(h) by the Capital Corporation are invalid.

The Court ORDERS:

1) that defendants are permanently enjoined from taking any action pursuant to said regulations, including but not limited to requiring System institutions to purchase the Capital Corporation's capital stock and debt obligations and assessing System institutions for Capital Corporation operation expenses; and

2) that plaintiffs shall receive their costs herein.

Therefore, the Court hereby ALLOWS plaintiffs' motion for summary judgment, DENIES defendant Farm Credit Administration's cross-motion for partial summary judgment, and DENIES defendant Farm Credit System Capital Corporation's cross-motion for summary judgment.

It is So Ordered.

ON MOTION TO DISMISS

This matter is presently before the Court upon the defendants' unopposed joint motion to dismiss for failure to state a claim upon which relief may be granted. Fed.R. Civ.P. 12(b)(6).

Plaintiff's claim against each of the three defendants is based upon a regulation[1] which this Court has held procedurally and substantively invalid. (See page 1241). The Court will therefore allow defendants' motion.

1. 51 Fed.Reg. 21332 (June 12, 1986), to be codi-

The Court hereby ALLOWS defendants' joint motion to dismiss for failure to state a claim upon which relief may be granted.

It is So Ordered.